JENNER v. BOWEN.

(Circuit Court of Appeals, Sixth Circuit. June 6, 1905.)

No. 1,393.

1. PATENTS—PRIOR PUBLIC USE—EXPERIMENTAL USE.

The duplication of a set of rollers on a machine which was before complete and operative, and had been in use for two years, the purpose being merely to re-enforce the work of the original rollers in certain cases where necessary, did not constitute a part of the invention of the machine, so as to extend the time within which a patent might be applied for.

[Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, §§ 99, 100.]

2. SAME—PUBLIC USE.

Where the inventor of a machine made and set up one for a customer, who paid for it and used it commercially, selling the product, as was intended, neither he nor his employés being under any obligation of secrecy, such use was public and not private, and its continuance for more than two years before application for a patent deprived the inventor of the right to a patent.

[Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, §§ 93–97.]

3. SAME—EFFECT OF INVENTOR'S INSANITY.

The right of one who purchased an unpatented machine from the inventor, with the intention and understanding that it was to be used commercially, to so use the same, is not terminated by the subsequent insanity of the inventor, and such continued use prior to the application for a patent constitutes a prior public use within the meaning of the patent law.

4. SAME—STATUTE AUTHORIZING APPLICATION BY GUARDIAN—SCOPE.

The amendment of February 28, 1899, c. 227, 30 Stat. 915 [U. S. Comp. St. 1901, p. 3385], to Rev. St. § 4896, authorizing the guardian of an insane person to file an application for a patent upon an invention made by such person before his insanity, and providing that it shall cover "all applications now on file in the Patent Office or which may be hereafter made," is at least limited as to its retroactive effect to giving effect to pending applications as of the date of their filing, and, if at that time the invention had been in public use for more than two years, the right to a patent thereon is not saved by the fact that the inventor became insane before the expiration of that time.

5. SAME—PRIOR PUBLIC USE—MACHINE FOR MAKING BOTTLE WRAPPERS.

The Biedinger patent, No. 639,395, for a machine for making bottle wrappers, is void for prior public use of the machine for more than two years before the filing of the application.

Appeal from the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

The following is the opinion of the court below:

In performance of the contract of September 4, 1890, Biedinger furnished Bowen a machine for making bottle wrappers, in using which it was necessary to cut off the diagonal wings at the neck of the wrapper and afterwards paste them on by hand. The expense for labor in pasting them on by hand was considerable. In March, 1892, Biedinger made material and valuable improvements upon the machine, whereby the wrapper complete was automatically produced, and the expense of hand labor was dispensed with. The machine, so improved, is the device of the patent in suit. Afterwards Biedinger became insane, and on the 18th day of December, 1893, was committed to the asylum at Longview. On or about the 26th day of January, 1894, Jenner was appointed his guardian, and on the 20th day of November, 1895, filed the application for the patent in suit, which was thereafter issued on the 19th day of December, 1899.

Of the defenses set up, only that of prior use will be considered. The machine was operated from March, 1892, to November 20, 1895, when the application was made, and the evidence shows beyond question that during that time wrappers were made and sold to the trade; but it is claimed by the complainant that this was not a public use, and that the making of the wrappers was merely incidental to experimental operation of the machine, conducted for the purpose of perfecting it, and with a view to obtaining a patent therefor when so perfected. The law will permit experimental use and the sale of the thing made, provided that such making and sale be strictly incidental to, and not the object of, the use. Lettelier v. Mann (C. C.) 91 Fed. 917; Smith & Griggs Mfg. Co. v. Sprague, 123 U. S. 249, 8 Sup. Ct. 122, 31 L. Ed. 141. Here the evidence shows conclusively that whatever was done in perfecting the machine was wholly incidental to, and in occasional interruption of, a large and flourishing business in the manufacture of bottle

wrappers. The machine would make 200 wrappers in a minute, and was operated about 9 hours a day. Biedinger traveled about the country soliciting the patronage of wrapper users, and the net profits of the business for the years 1892, 1893, and 1894 were $1,062.79. A profit of $1,468.27 was made from May 1 to September 1, 1893, but there was a large increase of merchandise on hand. The contract of September 4, 1890, required that the machine should be used for carrying on business, and Biedinger's livelihood depended upon the income derived from it. Nor can the delay in applying for the patent be justified upon the ground that the additional press rolls which were supplied in February, 1894, were necessary to the practical operation of the machine. These would further facilitate its efficient working, but would add nothing to the invention. Nor can the delay be excused upon the ground of the inventor's physical and mental weakness. The invention having been reduced to practice, the statute began to run, and its running could not be stayed otherwise than by filing the application. Sisson v. Gilbert, Fed. Cas. No. 12,912, 22 Fed. Cas. 236. The statute authorizing the guardian to sue was passed after the application was filed, and provides that the right of the insane inventor to apply for and obtain the patent shall devolve upon his guardian "in as full manner and on the same terms and conditions" as the same might have been claimed or enjoyed by the inventor. Nor does the evidence sustain the complainant's claim that the use was secret; the great weight of the evidence is to the contrary. The defense of prior use, therefore, must be sustained.

I have reluctantly reached this conclusion, because of the hardship to which it subjects the inventor. Whatever may be said of the defendant's right under the contract of September 4, 1890, to use the machine of 1892, he certainly has no right to use the machine of 1899, made for him by Muenzenmeier, other than such as results from the constructive abandonment of the invention because of the inventor's failure to file his application within the statutory limitation. The invention was Biedinger's, and was a valuable one. He was deprived of the benefit of it through the misfortune that befell him when he was committed to Longview. It may be that the guardian would have filed the application in time but for the unjustifiable action of the defendant in refusing to allow Mrs. Biedinger to obtain drawings of the machine, and, if the complainant and defendant were the only parties concerned, the defendant might, upon that ground, be held to be estopped from setting up the defense of prior use; but the interest of the public in the invention cannot be ignored. The limitation of the statute is founded upon public policy, and that policy must be enforced, even though it may work a hardship to the inventor.

There will be a finding in favor of the defendant.

Walter F. Murray, for appellant.

A. F. Herbsleb and W. H. Jones, for appellee.

Before LURTON and SEVERENS, Circuit Judges.

LURTON, Circuit Judge. This is a bill to enjoin infringement of a patent issued to Charles G. Jenner, as guardian for Charles G. Biedinger, an insane person. The patent is numbered 639,395, and is for certain improvements in machines for making bottle wrappers. The principal defense, and the only one which seems to have any very solid foundation, is that the patented invention was in public use for more than two years prior to the date of the application for a patent. We come at once to a consideration of this defense.

The application upon which the patent issued was filed November 20, 1895. The evidence establishes beyond the shadow of a doubt that a machine constructed according to the claims of the patent has been in the possession and use of the defendant Bowen since March, 1892. Was that use such a public use as to amount to a surrender of the patent to the public?

The machine in Bowen's possession was made under plans devised by Biedinger, and was set up in Bowen's shop by the inventor under a written contract between Biedinger and Bowen of November 4, 1890. That contract was an agreement by which Biedinger assigned to Bowen the exclusive right to make and sell an "improved paper bottle wrapper" devised by Biedinger, and for which he had applied for a patent. For this exclusive right Bowen agreed to pay a royalty upon all wrappers made and sold by him. To enable Bowen to manufacture such wrappers, Biedinger agreed to make and supply Bowen with an efficient machine, for which Bowen was to pay him $500 in installments. Biedinger failed to get a patent upon his "bottle wrappers," but he did plan and make a working machine for their manufacture according to his agreement, and did set same up in Bowen's shop, and was paid according to the contract. That machine completed, and operating in all substantial respects according to the terms of the patent in suit, was put in operation in March, 1892, and ever since has been turning out improved bottle wrappers, and upon them Bowen paid the royalty mentioned in the patent for several years, and avows that the contract still subsists, and that he is willing to account for royalty as provided in the agreement of November 4, 1890. Concerning this use, the counsel for the complainant have insisted: First, that it was experimental; second, that it was a secret use; and, third, that the patentability of the invention was saved to the inventor by the occurrence of his insanity before the two years allowed for filing an application. These in the order stated.

The first machine made by Biedinger for Bowen cut off the corners of a paper tube, formed during the earlier steps in the operation of the machine, and these corners had to be gathered up and pasted by hand across the severed corners to form the finished bottle wrapper. This involved no slight expenditure of labor, and limited the output. To avoid this, Biedinger made certain changes in the machine, by which the corners, instead of being cut off and pasted back, were mechanically turned back in proper position and then glued down. This doing by mechanism a part of the operation originally done by hand involved the passing of the wrapper, after the corners had been turned down and glue applied, through rollers to compress the corners and cause the glue to adhere. The rollers used for this purpose are the rollers, S, S, of the patent. When the paper used was extra heavy, it was found that more than one set of rollers might be used to cause the corners to adhere closely as folded back, and the addition of such rollers, if found useful, was contemplated from about the time the machine was first adapted to fold back the corners. The possible value of such additional rollers is mentioned in the specifications, where it is said:

"From the rolls, S, the finished bottle wrappers may be fed on through steam-heated drying rolls (not shown) to effectually dry the paste, both at the joint forming the tube and at the overwrapped neck portions."

The change in the original machine was made and the improved machine put in use as early as March, 1892, though it had but one set of rollers, until some time in 1894, when it was found expedient and convenient to add additional rollers for use with heavy paper, though "steam-heated drying rolls" have never been added or found useful, the heat tending to keep the glue soft and thus prevent adherence. The contention that the addition of other sets of rollers constituted such an addition to an unfinished machine as to enable the inventor to obtain a valid patent upon the old machine cannot be sustained. The invention was embodied in the machine as completed in March, 1892. It was a workable and commercially valuable machine without additional rollers. The rollers, S, S, through which the completed wrappers were fed, had no other function than to compress the glued corners in place and cause them to adhere. If the paper was so stiff as that the adherence was imperfect in some cases, it was a perfectly obvious expedient to duplicate the roller for the purpose of giving the glue or paste more time to set. If the paper was thin, additional rollers were not needed, and for nearly two years no additional rollers were used; but with heavy paper the corner or wing was liable to spring open and require some manipulation by hand. It is very clear that the mere duplication of the rollers did not constitute any part of the real invention, or in any substantial way change its character. The invention was in its essence complete before they were added, and its patentability is not saved by the subsequent addition of rollers.

But it is said that the use of the machine in Bowen's shop was secret, and not public. We have examined the evidence upon this subject with a good deal of care, being inclined to save this patent, if it could be done under the law, but only to find that neither the inventor nor Bowen used any of the precautions usual when it is desired to keep an invention secret. There was little or no difficulty in any one who chose seeing its operation, and the employés were placed under no obligation of secrecy. That the number of persons who had an opportunity to see the machine in operation was limited, and included some who, by reason of youth and inexperience, were not likely to understand or be able to describe the mechanism, is of no great importance, in view of the fact that the inventor made and set up this machine for Bowen for the purpose of being commercially operated. Bowen understood its mechanism and its method of use, and was under no restriction as to the place or manner of its operation, and under no obligation of secrecy. In Egbert v. Lippman, 104 U. S. 333, 336, 26 L. Ed. 755, it was said:

"Whether the use of an inventor is public or private, does not necessarily depend upon the number of persons to whom its use is known. If an inventor, having made his invention, gives or sells it to another to be used by the donee or vendee, without limitation or restriction, or injunction of secrecy, and it is used, such use is public, within the meaning of the statute, even though the use and knowledge of the use may be confined to one person."

When the object of the use is the perfecting of an invention, the sale of the product, if strictly incidental to an experimental use,

is not a public use under section 4886 of the Revised Statutes, and will not defeat a patent. A use which is impliedly excepted out of the prohibition of the statute is a use which may be properly characterized as substantially for purposes of experiment. "When the substantial use is not for that purpose, but is otherwise public, and for more than two years prior to the application, it comes within the prohibition." Smith & Griggs Mfg. Co. v. Sprague, 123 U. S. 249, 256, 8 Sup. Ct. 122, 31 L. Ed. 141; International Tooth Crown Co. v. Gaylord, 140 U. S. 55, 63, 11 Sup. Ct. 716, 35 L. Ed. 347; Root v. Third Ave. Rd., 146 U. S. 210, 225, 13 Sup. Ct. 100, 36 L. Ed. 946; Eastman v. Mayor, etc., of New York (C. C. A.) 134 Fed. 844.

Aside from the general consequence of a sale of a machine to Bowen, embodying the principles of Biedinger's invention, for the purpose of being commercially used, the fact that Bowen did use the machine, not experimentally, not for the purpose of testing its capability of forming wrappers, but for profit, is too plain to need argument. It was capable of making about 200 finished wrappers per minute, and was operated about 9 hours per day for more than 3 years before application filed. Biedinger knew this. He sold the machine that it might be so used. He claimed and was paid a royalty upon the wrappers so made, and for a considerable part of the time was in the service of Bowen, as a salesman for the wrappers. Counsel attempt to explain or justify this use by saying that the object was:

"First, to determine whether or not the machine would produce good, salable wrappers; and, second, would it produce them at a cost which would prove profitable? To determine this latter question, it would be necessary to make and sell the wrapper."

This extraordinary contention is supported by the citations of Elizabeth v. Pavement Co., 97 U. S. 126, 24 L. Ed. 1000. The subject of the patent in that case was a pavement. Durability when subjected to the wear of a pavement was essential to the usefulness of the invention. The patentee, to determine this, after suing out a caveat, put down at his own cost a small section upon a public street, where it was in use for more than two years before he filed his application for a patent. This use was, having regard to the subject-matter, experimental. It was the only kind of experiment which was available as a test of the durability of the discovery. It was not for profit. That no such use as that to which Bowen put Biedinger's invention was necessary to determine whether it would make a wrapper, is manifest. The operation of the machine for a few hours would determine whether it would do what it was intended to do. The determination of whether the wrapper produced would be salable at a price which would be profitable was not an inventor's test, but that of a manufacturer or dealer in wrappers. To say that a use of an invention before application for such purposes is not a public use would be to carve out an exception to the statute which makes the granting of a patent conditional upon the invention not having been in public use for two years before application filed. Smith & Davis Co. v. Mellon, 58 Fed. 705, 707, 7 C. C.

139 F.—36

A. 439. There is no room for the application of Elizabeth v. Pavement Co., 97 U. S. 126, 24 L. Ed. 1000, to facts so dissimilar as those presented by the case before us.

That Biedinger's invention was in public use for more than three years before an application was filed for a patent is the conclusion we reach, and that this fact must defeat his patent is also plain, unless there be some salvation for him in the fact that he became insane before there had been two entire years of public use. This insanity suddenly manifested itself late in December of 1893, and in January he was duly found insane, and the complainant Jenner was made his guardian. At this crisis there remained three months' time during which an application might have been filed, if there had been any one legally capable of making an application. The trouble was that there was then no law authorizing the guardian to file an application for a patent upon an invention made by an insane person. The law which for the first time took cognizance of such a situation was passed February 28, 1899, c. 227, 30 Stat. 915 [U. S. Comp. St. 1901, p. 3385]. The act of that date amended section 4896, Rev. St., which authorizes the administrator or executor of a deceased inventor to file an application for an invention, made by his intestate or testator, by providing that the guardian of an insane person might file an application upon an invention made by such person before his insanity. The last clause of that act provides that it "is to cover all applications now on file in the Patent Office or which may be hereafter made." Jenner, as guardian, at date of this act had on file an application for a patent upon Biedinger's invention. That application was filed November 20, 1895, and is the application upon which the patent in suit issued. There was no authority of law for its filing at the time it was filed, but that trouble, we shall assume, was cured by the retroactive effect of the act of 1899. But as the date of that application was November 20, 1895, we are confronted with the fact that at that date the invention of Biedinger had been in public use for more than three years. The contention of the complainant is that after Biedinger's insanity the use of his invention by Bowen was an illegal and fraudulent use, a use without the knowledge or consent of the inventor, and therefore not the kind of public use prohibited by the statute. But the use of this machine by Bowen was neither fraudulent, surreptitious, nor piratical. The inventor made and sold him the machine with the intent and purpose that it should be used for commercial purposes. Section 4899 expressly provides that every one "who purchases of the inventor or discoverer or with the knowledge and consent constructs any newly invented or constructed machine, or other patentable article, prior to the application by the inventor or discoverer for a patent, or who sells or uses one so constructed, shall have the right to use, and rent to others to be used, the specific thing so made or purchased, without liability therefor." So much for Bowen's right to use the Biedinger machine.

By section 4886, Rev. St. [U. S. Comp. St. 1901, p. 3382], the right

of an inventor to obtain the exclusive benefit of his discovery is made dependent upon its not having been "in public use or on sale for more than two years prior to his application." The question as to whether a fraudulent and piratical use of an invention, without the knowledge of the inventor, for more than two years before application, will defeat a patent, is not before us. Bowen's use was with the knowledge and consent of the inventor, and his right is absolutely protected, in the specific thing, by the express terms of the law. If that use was continued for more than two years before an application, time ascertained by counting back from date of application, we can see no exception in favor of an insane inventor. Under the provisions of the statute, the application must be made before a public use of two years. Knowledge of the invention not having been obtained from the inventor by fraud, there is no room for the application of the doctrine of Kendell v. Winsor, 21 How. 322, 16 L. Ed. 165, even if there is room for the view there expressed, since the act of 1836 was superseded by other legislation. The subject is fully considered, and the cases all examined, in Andrews v. Hovey, 123 U. S. 267, 8 Sup. Ct. 101, 31 L. Ed. 160, and same case on rehearing in 124 U. S. 694, 8 Sup. Ct. 676, 31 L. Ed. 557, and by Judge Coxe for the Second Circuit Court of Appeals in Eastman v. Mayor of New York (C. C. A.) 134 Fed. 844, 851.

Congress, having created the monopoly, may put such restrictions upon it as it pleases. Having made no exception in favor of an insane person, we can make none. Indeed, Congress made no provision whatever whereby an inventor who becomes insane before filing an application could obtain the benefit of his discovery until this invention had been in public use nearly seven years. That act did retroact so as to apply to pending applications, but this is all. It in no way provides that the effect of a prior public use for two years shall be any the less fatal if the negligent inventor is insane than if he was sane. Neither does the act of February, 1899, in so far as it applies to pending applications, operate as a congressional grant of a valid patent to pending applications in behalf of insane persons. The legislation is general in its terms, and the individual motive of a particular congressman cannot affect the interpretation of the law or extend its application. Its curative or retroactive effect is limited, at most, to giving effect to pending applications as of the date of their filing. If, when this is done, it then appears that there had been a public use of the invention for more than two years before the date of filing, the invention is open to the public, and the public right is paramount to that of the inventor. We therefore regretfully conclude that Biedinger's invention was not entitled to a patent, and that the public are entitled to the benefit of his discovery.

The decree dismissing the bill is accordingly affirmed.